Adam D. Brumm, Esq.  SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company,<br><br>       Plaintiff,<br><br>    vs.<br><br>ALTIUM PACKAGING LP, a Delaware Corporation doing business in California as Consolidated Container Company, LP; and DOES 1-10, inclusive,<br><br>       Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC ("EDEN" or "Plaintiff") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## I.    <u>INTRODUCTION</u>

1.    This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendant ALTIUM PACKAGING LP ("Defendant") for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

**Notice Letter**

2.  On or about August 19, 2024, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendant, including a copy delivered to Defendant by certified mail, to Facility Manager, Altium Packaging, 75 West Valpico Road, Tracy, California ("the facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.  A copy of Plaintiff's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.  More than sixty days have passed since Plaintiff's Notice was properly and lawfully served on Defendant, the State Board, and the Regional and National EPA Administrators.

5.  Plaintiff is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

6.  This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II. PARTIES

**Plaintiff**

7.  Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS is an environmental membership group organized under the laws of the State of California.

**Defendant**

8.  Plaintiff is informed and believes, and on such information and belief alleges, that Defendant ALTIUM PACKAGING LP, a Delaware corporation domiciled in Atlanta, Georgia, doing business in California as Consolidated Container Company LP, formerly known as Consolidated Container Co, LLC, located at 75 West Valpico Road, in Tracy, California, is

currently registered with the California Secretary of State as a corporation in good standing with the Delaware Secretary of State.

9.    Plaintiff is informed and believes, and on such information and belief alleges, that Defendant Altium Packaging LP, formerly known as Consolidated Container Co, LLC, is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the facility.

### III.    JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

11.    Venue is proper because Defendant resides in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

### IV.    ARTICLE III STANDING

12.    Plaintiff's organizational purpose is the protection, preservation and enhancement of the rivers, creeks, streams, lakes and oceans (and their tributaries) in California.

13.    Plaintiff's organizational purpose and mission is accomplished through enforcement of the provisions of the Federal Clean Water Act and California's Industrial General Permit, in seeking redress against Industrial Dischargers who violate the CWA by failing to comply with all standard conditions of the Industrial General Permit.

14.    Plaintiff's associational members volunteer their resources to join EDEN's organizational purpose and mission.

15.    Plaintiff's associational members reside throughout Northern California. Some of EDEN's members reside, work and/or recreate near the San Joaquin River, a tributary of the

Sacramento-San Joaquin River Delta Waterways (the "Receiving Waters" for Defendant's storm water run-off), and use those waters and their watersheds for kayaking, canoeing, cycling, recreation, duck hunting, sportfishing, swimming, hiking, bird watching, photography and nature walks.  Their use and enjoyment of these natural resources has been and continues to be adversely impaired by Defendant's failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA.

16.    Plaintiff has Article III standing as an association to bring this suit against Defendant, as at least one of EDEN's current members is experiencing an ongoing, concrete, and particularized injury fairly traceable to Defendant's violations of the CWA and Industrial General Permit, which likely can be redressed by a judicial decision granting Plaintiff the injunctive relief requested herein.

17.    The aesthetic and recreational interests of the individual associational members of Plaintiff with Article III standing have been adversely impacted by Defendant's failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA, as delineated herein.

18.    Plaintiff's associational members who qualify for standing in this matter are all current members who have been members of EDEN since at least August 19, 2024, the date that Plaintiff provided to Defendant the Notice Letter attached hereto as **Exhibit A.**

19.    Defendant's ongoing violations of the General Permit and the CWA have and will continue to cause irreparable harm to Plaintiff and its current standing members.

20.    The relief requested herein will redress the ongoing injury in fact to Plaintiff and its members.

21.    Neither litigation of the claims asserted, nor the relief requested in this Complaint, will require the participation in this lawsuit of any individual members of EDEN.

## V.  STATUTORY BACKGROUND

22.    Congress declared that the Federal Clean Water Act was designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters through federal

and state cooperation to develop and implement programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters. 33 U.S.C. §§ 1251(a), 1252(a)

23.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into Waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act.  33 U.S.C. § 1342

24.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to Dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water Dischargers. 33 U.S.C. § 1342(p)

25.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board to issue NPDES permits, including general NPDES permits in California.

Citizen Suit Provision of the CWA

26.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1)

27.     No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation to: (i) the Administrator of the EPA; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A)

28.     By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

29.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a).   Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, $56,460.00 per day per violation for violations occurring after November 2, 2015; and $57,617.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI(Q(1)

30.     Violations of the provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4

A.  **General Permit**

31.     The Water Board elected to issue a statewide General Permit for industrial storm water discharges.   Thus, the Permit under which this case arises is a federally required permit based upon California state substantive law.  *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016)

32.     The Water Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The Permit was reissued on April 17, 1997, and again on April 1, 2014 ("General Permit"), pursuant to Section 402(p) of the Clean Water Act. 33 U.S.C. § 1342(p)

33.     The current General Permit went into effect on July 1, 2015, after which it was amended again on November 6, 2018, with the revisions becoming effective on July 1, 2020. [See California's Industrial General Permit, Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ and Order WQ 2018-0028-DWQ, which is fully incorporated herein by reference.]

34. A complete copy of the current General Permit Order is accessible at https://www.waterboards.ca.gov/water_issues/programs/storm_water/igp_20140057dwq.html

35. The General Permit includes both absolute *discharge prohibitions* and substantive and procedural *standard condition* provisions.

36. To discharge storm water lawfully in California, all industrial facilities discharging, or having the potential to discharge, storm water associated with industrial activity ("Dischargers") which have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing Permit Registration Documents, including a Notice of Intent to Discharge Storm water ("NOI") and an initial Storm Water Pollution Prevention Plan ("SWPPP") and Site Map.

37. The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

### 1. **SMARTS Compliance Database**

38. The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS"). SMARTS is a platform where Dischargers enter and manage storm water data associated with General Permit compliance.

39. SMARTS is readily accessible by the general public on the web; and the system is maintained primarily for the purpose of providing public access to allow citizens to monitor Dischargers' compliance with the General Permit and to pursue Dischargers who fail to comply, utilizing the citizen's suit provision of the CWA.

40. SMARTS can be accessed at California Stormwater Multiple Applications and Report Tracking System.

41. The General Permit requires Dischargers to certify (under penalty of law) and submit to SMARTS all Permit Registration Documents, including Notices of Intent to Discharge Storm Water, Storm Water Pollution Prevention Plans and Site Maps; monitoring and sampling data, Exceedance Response Reports and Annual Reports. General Permit §§ I(A)(17), II(A)(1), II(B)(1), II(D), XI(B)(11)(a), XXI(K), XXI(L), Attachment D.

### 2.  Discharge Prohibitions of the General Permit

42.    The discharge related prohibitions of the General Permit include Effluent Limitation V(A) of the General Permit, which requires Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

43.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

44.    Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plans or the applicable Regional Water Board's Basin Plan.

### 3.  Standard Conditions of the General Permit

45.    In addition to discharge prohibitions, the General Permit contains a variety of substantive and procedural standard conditions.

46.    The General Permit requires that Dischargers comply with all standard conditions of the Permit and indicates that failure to comply with any standard condition of the General Permit constitutes an actionable, per se violation of the CWA, which comports with the provisions of 33 U.S.C. §1365(f)(7).  General Permit § XXI(A)

47.    The primary standard conditions of the General Permit include the following:

(a)    Continuously maintaining an accurate, up-to-date and compliant *SWPPP and Site Map*; implementing all provisions of the SWPPP, and certifying and submitting the SWPPP to SMARTS;

(b)    Implementing and maintaining *Best Management Practices*;

(c)    Conducting monthly and sampling event *visual observations*, contemporaneously completing observation reports and maintaining the reports for five years;

(d)    Collecting and analyzing *storm water runoff samples* four times per year;

(e)    Collecting the *storm water samples during qualified storm events, from all discharge locations, in all drainage areas* in places which are representative of industrial operations;

(f)    Testing the collected storm water samples for *all required parameters,* using the correct EPA test methods, and the prescribed sample holding times; and reporting the results to the Water Board within 30 days by certifying and submitting them to SMARTS;

(g)    Conducting *Annual Facility Compliance Evaluations* and contemporaneously preparing and retaining evaluation reports;

(h)    Preparing compliant *Exceedance Response Reports* in the event that storm water sampling data confirms an annual exceedance of any sampling parameter within the specified time limits, and certifying and submitting the reports to SMARTS;

(i)    Preparing complete and accurate *Annual Reports* and certifying and submitting them to SMARTS; and

(j)    Establishing a *Pollution Prevention Team* of at least two on-site employees and ensuring that the Team remains fully trained on all aspects of compliance with the General Permit.

SWPPP and Site Map Requirements

48.    All Dischargers are required to develop and implement a Storm Water Pollution Prevention Plan.

49.    The main objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the Discharger's facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit § X(C).  These BMPs must achieve compliance with the General Permit's

effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

50.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised within ninety (90) days when there are routine revisions to be made; and within thirty (30) days whenever the SWPPP requires significant revisions. General Permit § X(B)

51.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP when necessary, is a violation of the General Permit. General Permit §§ I(J)(68), II(B)(3)(a), X(A), X(B), General Permit Fact Sheet § I(1)

52.     Among other requirements, the SWPPP must include: a detailed description of the facility's industrial processes and operations; identification of a pollution prevention team; a site map; a list of industrial materials handled and stored at the site, including the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency; a description of potential pollutant sources; an assessment of potential pollutant sources (specifically, whether the pollutants have the potential to commingle with storm water);  a monitoring implementation plan, including a discussion of facility drainage, drainage areas, and discharge points and sampling locations; all mandatory sampling parameters; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges.   General Permit §§ X(A)-X(I)

53.     The General Permit also requires that SWPPPs include detailed BMP Descriptions and a BMP Summary Table.  General Permit § X(H)(4), (5)

54.     Site Maps are required to depict the following: the facility boundary, storm water drainage areas, storm water flow direction, on-site surface water bodies and/or locations of nearby water bodies, municipal storm drain inlets that receive storm water discharges, locations of storm water collection and conveyance systems, associated discharge locations, sampling locations, locations and descriptions of structural control measures, identification of all impervious areas, locations where materials are directly exposed to precipitation, locations where

significant spills or leaks have occurred, and all areas of industrial activity, including industrial storage areas.  General Permit § X(E)

<u>Best Management Practices</u>

55.    The General Permit requires all Dischargers to implement and maintain the following minimum Best Management Practices to reduce or prevent pollutants in industrial storm water discharges at their facility: Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program, and Quality Assurance and Record Keeping. General Permit § X(H)(1)

56.    The General Permit further requires Dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit § X(H)(2)

57.    Failure to implement minimum and advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. General Permit Fact Sheet §I(I)(2)(o)

<u>Monitoring and Reporting/Storm Water Sampling and Analysis</u>

58.    The General Permit requires Dischargers to develop and implement an adequate Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

59.    As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce storm water discharges, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

60.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

61.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

62.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload to SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit §§ XI(B)(8), XI(B)(11)

63.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, all additional parameters indicated in the Permit by facility type (standard industrial classification code), and all parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit § XI(B)(6)(c)

64.     Facilities are also required to conduct monthly and sampling event visual observations.   Monthly visual observations are conducting during dry weather and must include observing each drainage area for the presence of non-storm water discharges; as well as inspecting outdoor industrial equipment and storage areas, outdoor industrial activities areas, and all other potential sources of industrial pollutants, and monitoring BMPs for effectiveness.  Sampling event visual observations are conducted at the same time as sampling occurs at a discharge location and must include observing storm water discharges for the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris and sources of any discharge pollutants.  General Permit § XI(A)

65.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair or contribute to impairing water quality or affect human health from ingestion of water or fish.

66.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks.  The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

67.     The NALs established under the General Permit for pollution parameters applicable to all Dischargers are set forth in Table 2 of the General Permit, which is incorporated herein by reference.

<u>NAL Exceedances-Exceedance Response Actions</u>

68.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than the annual NALs, which are listed on Table 2. The reporting year runs from July 1 to June 30.

69.     An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A), Table 2

70.     When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status" commencing July 1 of the reporting year following the entry into Level 1 status.

71.     Once a Discharger has entered Level 1 Status, by October 1 following commencement of Level 1 status, it must conduct a thorough facility evaluation with the assistance of a Qualified Industrial Stormwater Practitioner (QISP) of all drainage areas to determine the industrial pollutant sources at the facility that are or may be related to the

exceedance(s), and identify the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future exceedances.   General Permit § XIII(C)

72.     By January 1 following commencement of Level 1 status, the Discharger must revise its SWPPP, implement any additional BMPs identified in the evaluation, and certify and submit to SMARTS a Level 1 Exceedance Response Action (ERA) Report.  General Permit § XIII(C)

73.     If a discharger exceeds an applicable NAL during Level 1 Status, it is elevated to "Level 2 Status."  General Permit §XII(D)

74.     On January 1 of the reporting year following entry into Level 2 Status, a Discharger is required to submit to SMARTS a Level 2 ERA Action Plan identifying its selection of one of three options to remediate the continuing exceedances: implementation of additional BMPs, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  The Action Plan must also include a schedule for completion of the tasks.  General Permit § XII(D)(1)

75.     On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, the Discharger is required to submit a Level 2 Technical Report demonstrating its efforts to implement the additional BMPs or confirming the non-industrial sources of the pollutants causing the exceedances.  General Permit § XII(D)(2)

Annual Comprehensive Facility Evaluation

76.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  General Permit § XV

Annual Reports

77.     Section XVI(A) of the General Permit requires all Dischargers to certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year.

78.     Annual Reports are auto populated by SMARTS from Dischargers' answers to a series of twelve questions, which require mostly yes/no responses.

79.     The questions include whether the Discharger has conducted monthly visual observations, collected and analyzed the required number of storm water samples from all discharge locations at its facility; and where the facility is located within an impaired watershed, the Discharger has assessed whether any of the receiving water impairments are potential pollutants present at their facility.

80.     Any "no" responses to the above questions require a complete and accurate explanation, certified under penalty of law.

<u>Certification of Compliance Documents</u>

81.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible Party (LRP) or Duly Authorized Representative (DAR) of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

**B.  <u>Central Valley Region Basin Plan</u>**

82.     The Regional Water Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," generally referred to as the Basin

Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

83.    The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

84.    The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

85.    The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

86.    The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

87.    The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

88.    The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

89.    The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A

(Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

90.    The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

91.    The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

92.    Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L.

## VI.    SPECIFIC FACTUAL ALLEGATIONS

### A.    The Facility

93.    Altium Packaging, located at 75 West Valpico Road in Tracy, California, is a facility that manufactures blow molded plastic bottles.

94.    Plaintiff is informed and believes that the facility falls under standard industrial classification ("SIC") code 3085-Plastic bottles, based on public records.

95.    SIC Code 3085 is included in Attachment A of the General Permit as a type of industrial operation that requires application for and receipt of General Permit coverage.

96.    Defendant stores and handles industrial chemicals and materials outdoors that are exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

97.    During rain events, storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the Facility settle onto the ground.

98.    Storm water flowing over these areas collects suspended sediment, dirt, metals, and other chemicals and toxic pollutants as it flows towards the Facility's storm water channels, and discharges from the Facility into its Receiving Waters.

99.     Based on the foregoing, Plaintiff alleges that Defendant is required to maintain standard General Permit coverage and is not eligible to apply for or receive either No Exposure Certification (NEC coverage) or Notice of Non-Applicability (NONA coverage).

**B.  The Facility's Receiving Waters**

100.    Based on Plaintiff's investigation, including but not limited to a review of the Defendant's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"); SWPPP and Site Map, aerial photography and drone footage; federal, state and local regulatory agency mapping tools; and eyewitness reports, storm water leaves the boundaries of Defendant's facility and enters Delhi Channel Old River, via both the Westside Channel  and surface flow, before discharging to San Joaquin River, a navigable Water of the United States.

101.    Plaintiff alleges that the Best Management Practices at Defendant's facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to Waters of the United States.

**C.  Defendant's General Permit Violations**

Deficient SWPPP/Failure to Follow SWPPP

102.    Plaintiff alleges that since at least August 20, 2019, Defendant has failed to implement an adequate SWPPP for the facility and has failed to comply with the terms of its deficient SWPPP, in violation of the standard conditions of the General Permit.   General Permit §§ I(J), II(A)(1), II(B)(1)(b), II(B)(3), X, XXI(A), XXI(K)(1), XXI(L); General Permit Fact Sheet § II(I)(1); 33 U.S.C. § 1365(f)(7)

103.    Defendant's continuing failure to implement and follow an adequate SWPPP is evidenced by documents uploaded and certified to SMARTS under penalty of law by Altium Packaging, as well as by required documents which have not been uploaded to SMARTS.

104.    Defendant's continuing failure to implement an adequate SWPPP is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies.

105.    As is more particularly described in **Exhibit A,** attached hereto and incorporated herein by reference, Plaintiff's Notice Letter issued to Defendant delineated numerous deficiencies in Defendant's SWPPP and Site Map uploaded to SMARTS on June 29, 2018.

106.    Defendant's June 29, 2018, SWPPP and Site Map remain deficient for failure to include the following:  (a) complete and accurate Pollutant Source Assessment and Industrial Material Inventory List [violation of General Permit §§ X(F), X(G) and XI(B)(6)]; (b) all mandatory sampling parameters [violation of General Permit § XI(B)(6)]; (c) sufficient detail regarding Facility operations and industrial processes [violation of General Permit § X(G)(1)]; and (d) accurate discussion and depiction of Facility drainage, discharge locations and sampling points [violation of General Permit §§  X(I) and X(G)(1)(e)].

107.    Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP and Site Map do not include sufficient information to comply with the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

108.    According to information available to Plaintiff, Defendant's current SWPPP has not been evaluated to ensure its effectiveness and has not been revised as required by the General Permit to reflect true conditions at the Facility and to prevent discharges of contaminated storm water.

109.    According to information available to Plaintiff, Defendant's current SWPPP and Site Map contains misleading, false or insufficient information regarding facility operations and processes; drainage, drainage areas and storm water flow; discharge locations and mandatory sampling points; the type, amount and location of industrial materials and chemicals handled at the facility; and all mandatory required sampling parameters associated with the facility's industrial materials and chemicals.

110.    Plaintiff alleges that Defendant's current SWPPP and Site Map do not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT.

111.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continue to fail to alter the Facility's SWPPP/Site Map and site-specific BMPs to comply with the requirements of the General Permit.

112.    In addition, Plaintiff alleges that Defendant has failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting.

113.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the San Joaquin River.

114.    Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendant's deficient SWPPP/Site Map are ongoing and continuous.

Monitoring and Reporting/ Storm Water Sampling

115.    Plaintiff alleges that Defendant's monitoring and reporting program at Altium Packaging in Tracy is deficient and in violation of the mandatory standard conditions of the General Permit.  General Permit §§ X, X(I), XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii); 33 U.S.C. § 1365(f)(7)

116.    Defendant's deficient monitoring and reporting program is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

117.    Defendant's deficient monitoring and reporting program is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and government agencies, as well as other relevant documents maintained by Defendant and governmental and regulatory agencies.

118.    Since August 20, 2019, Defendant has failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

119.    In addition, Defendant has failed to conduct monthly visual observations of storm water discharges at the facility since at least August 20, 2019.

120.    Defendant has also collected samples of storm water discharges at the facility that failed to comply with the General Permit's requirement that samples be preceded by a 48-hour period without a discharge, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

121.    Defendant has failed to collect storm water samples from each drainage area at all discharge locations at its facility, for each QSE where sampling is performed, pursuant to General Permit § XI(B), as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

122.    Defendant has failed to analyze the facility's storm water samples for all required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

123.    Defendant has failed to upload facility storm water sample analyses within 30 days of obtaining the results of the sampling event, in violation of Section XI(B)(11) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

124.    Defendant has failed to properly analyze its collected storm water samples for the parameter of pH, in violation of Section XI(C)(2)(a) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

<u>Falsification of Annual Reports</u>

125.    Since August 20, 2019, Defendant has submitted inaccurate and/or falsified Annual Reports to the Regional Water Quality Control Board in violation of the standard conditions of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ II(A)(1), XI(A)(C), XVI, XXI(K), XXI(L), XXI(N); General Permit Fact Sheet § II(O); 33 U.S.C. § 1365(f)(7)

126.    Defendant's submission of false Annual Reports and continuing failure to retract its false statements to the Water Board and the general public is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant.

127.    Defendant's submission of false Annual Reports is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

128.    Defendant's submission of false statements to the Water Board and the general public is ongoing and continuous.

<u>Failure to Implement BAT/BCT; BMP Deficiencies</u>

129.    Since at least August 20, 2019, Defendant has failed to identify and implement Best Management Practices ("BMPs") at the Facility which comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants.

130.    Defendant has also failed since at least August 20, 2019, to implement specific additional BMPs required of facilities which handle pre-production plastics. General Permit §§ XVIII

131.    These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

132.    Defendant's failure to implement proper minimum BMPs is in violation of the standard conditions of the General Permit.   General Permit §§ I(C), V(A), X, XXI(A); General Permit Fact Sheet §§ II(I)(2)(o); 33 U.S.C. § 1365(f)(7)

133.    Defendant's BMP deficiencies are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

134.    Defendant's BMP deficiencies are also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

135.    Defendant's BMP deficiencies are more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

136.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the facility to the San Joaquin River.

Failure to Train Employees

137.    Since at least August 20, 2019, Defendant has failed to implement and train a Pollution Prevention Team at the facility, in violation of the standard conditions of the General Permit.   General Permit §§, I(K)(70), I(K)(77), I(I)(63), IX(A)(3), X(D), XXI(A), 33 U.S.C. 1365(f)(7)

138.    The General Permit requires all Dischargers to designate a Legally Responsible Person to implement the requirements of the Permit.  The Legally Responsible Person is responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

139.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

140.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as

well as other relevant documents maintained by Defendant and governmental/regulatory agencies.

141.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is also evidenced by Defendant's ongoing and continuing General Permit violations.

142.    Other evidence of Defendant's failure to implement and train a Pollution Prevention Team includes the fact that previously designated Team Members have left the Facility and have been replaced without being trained, as well as that some of the designated Pollution Prevention Team Members are regional employees not assigned to work at the Tracy Altium Packaging Facility.

143.    In addition, Defendant was required to have a Qualified Industrial Stormwater Practitioner (QISP) conduct training of the Facility's Pollution Prevention Team after it entered Level 1 Status on , and to date has failed to do so.

144.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is ongoing and continuous.

**D. Information Injuries Caused by Defendant's General Permit Violations**

145.    In addition to harming the aesthetic and recreational interests of Plaintiff's members with standing in this matter, Defendant's violations of the standard conditions of California's Industrial General Permit have caused informational injuries to EDEN's standing members by depriving these members of their substantive constitutional and statutory rights to obtain information regarding Defendant's compliance with standard conditions of California's Industrial General Permit, which provisions have been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

146.    As set forth in more detail herein, Defendant has failed and refused to comply with all mandatory standard conditions of the General Permit, including maintaining a deficient SWPPP which includes objectively false information related to drainage, outdoor handling of industrial materials and storm water flow/sampling locations; failing to collect and analyze the

required number of storm water samples; failing to test storm water samples for the proper parameters; and providing incomplete and false information in Annual Reports.

147.    Defendant's failure to comply with the standard conditions of the General Permit as set forth above have prevented Plaintiff's members with Article III standing from: (a) accessing on SMARTS the true operational facts relevant to Defendant's facility; and (b) acquiring accurate and complete data related to the unmonitored pollutants emanating from Defendant's facility during rain events and discharging into the facility's Receiving Waters.

148.    As such, Plaintiff's members with Article III standing are unable to fully assess the extent of Defendant's General Permit violations, as well as the types and levels of pollutants entering the affected waterways due to Defendant's willful violations of the standard conditions of the General Permit; or to even gauge the potential health ramifications to themselves should they continue to recreate in the affected waterways.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

149.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

150.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP, including a Site Map.

151.    As outlined herein, Defendant has failed to develop and implement an adequate SWPPP for its facility.

152.    Each day since August 20, 2019 that Defendant has failed to develop, implement and update an adequate SWPPP for the facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

153.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and upload to SMARTS a compliant SWPPP and Site Map.

## SECOND CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

154.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

155.    The General Permit requires Dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

156.    As outlined herein, Defendant has failed to develop and implement an adequate monitoring and reporting program for the Altium Packaging facility.

157.    Each day since at least August 20, 2019, that Defendant has failed to develop and implement an adequate monitoring and reporting program for its facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

158.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop and implement a compliant monitoring and reporting program.

## THIRD CAUSE OF ACTION
### Submission of False Annual Reports to the Regional Water Board
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

159.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

160.    Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information. As delineated herein, Defendant made false representations in the Facility's Annual Reports and has failed to correct or retract the false statements.

161.    Furthermore, Defendant has submitted incomplete Annual Reports and Ad Hoc Monitoring Reports, in violation of General Permit Sections XI(B) and XVI.

162.    Each time since August 20, 2019, that Defendant submitted false or misleading statements to the Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

163.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's failure to withdraw any of the false and/or incomplete Reports submitted to the Water Board.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

164.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.  The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of Best Management Practices (BMPs), including Best Available Treatment (BAT) for toxic and nonconventional pollutants and Best Conventional Treatment (BCT) technologies for conventional pollutants.

165.    As alleged herein, Defendant has failed to implement BAT and BCT at the facility for its discharges of pollutants, in violation of Effluent Limitation V(A) of the General Permit.

166.    As alleged herein, Defendant has failed to implement the required minimum Best Management Practices at the Facility.

167.    Each day since at least August 20, 2019, that Defendant failed to implement the required minimum BMPs and to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

168.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and maintain adequate BMPs at its Facility.

## FIFTH CAUSE OF ACTION
### Failure to Properly Train facility Employees and Pollution Prevention Team
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

169.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

170.    Section X(D)(1) of the General Permit requires each facility to establish a Pollution Prevention Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

171.    Section X(H)(f) of the General Permit also requires that Dischargers ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained.

172.    Since at least August 20, 2019, Defendant has failed to properly implement and train a Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.  These violations are ongoing and continuous.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.     Declare Defendant to have violated and to be in violation of the CWA;

2.     Issue an injunction ordering Defendant to immediately operate the Altium PackagingAltium Packaging facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.     Enjoin Defendant from discharging pollutants to the surface waters surrounding its facility until such time as Altium Packaging has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.     Order Defendant to pay civil penalties of $57,617.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.     Order Defendant to take appropriate actions to restore the quality of United States waters impaired by activities at its facility;

6.     Order Defendant to pay Plaintiff's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

8.     Award such other and further relief as may be just and proper.

Dated:  December 23, 2024                                    Respectfully,


By: ___/S/ Adam D. Brumm_____
        Adam D. Brumm
        Attorney for Plaintiff

# EXHIBIT A



# EDEN

## *Central Valley* Eden Environmental Defenders

August 14, 2024

Via US Mail, Certified and Email

Greg Eaglin                    Email:  greg.eaglin@altiumpkg.com
Facility Manager
Altium Packaging
75 West Valpico Road
Tracy, CA 95376

Via US Mail

C T Corporation System
Agent for Altium Packaging LP
330 North Brand Boulevard
Glendale, CA  91203

Jason Borreo
G&I XI Central Valley Logistics Portfolio
575 Fifth Avenue, 38th Floor
New York, NY 10017

**Re:    60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Altium Packaging:

This letter is being sent to you on behalf of Central Valley Eden Environmental Defenders, LLC ("EDEN") to give legal notice that EDEN intends to file a civil action against Altium Packaging LP, dba Consolidated Container Company LLC, formerly known as Consolidated Container Company LP ("Discharger" or "Altium Packaging") and G&I XI Central Valley Logistics Portfolio LP ("Property Owner"), and the respective corporate officers and other legally responsible parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the Altium Packaging facility located at 75 West Valpico Road in Tracy, California ("the Facility" or "the site").

---

EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below. Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, duck hunting, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Altium Packaging, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous. As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Altium Packaging to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against Altium Packaging under CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.    THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-0028-DWQ) (hereinafter "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around July 29, 2002, Altium Packaging submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit; and on June 9, 2015, Altium Packaging reapplied for the General Permit effective July 1, 2015. Altium Packaging's assigned Waste Discharger Identification number ("WDID") is 5S39I017394.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Altium Packaging has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 Code of Federal Regulations §§122.22, 122.26; 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  **The Facility**

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Altium Packaging's permanent facility address of 75 West Valpico Road in Tracy, California.

Altium Packaging is a facility that manufactures blow molded plastic bottles. Facility operations are covered under Standard Industrial Classification Code(s) (SIC) 3085 - Plastic bottles.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 3085, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids (TSS), and various types of oil and grease (O&G), as well as Chemical Oxygen Demand (COD), Biochemical Oxygen Demand (BOD), Total Petroleum Hydrocarbons (TPH), Iron and Zinc.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.   The Affected Receiving Waters

The Facility discharges into the City of Tracy Westside Channel, which drains to the Old River, a tributary of the San Joaquin River ("Receiving Waters"). The Facility's Receiving Waters are impaired for Salinity, Group A Pesticides, Chloride, Chlorpyrifos, Diazinon, Dissolved Oxygen, Low Oxygen, Mercury, Electrical Conductivity, DDT (Dichlorodiphenyltrichloroethane), and Total Dissolved Solids.

The San Joaquin River is a water of the United States. The CWA requires that water bodies such as the San Joaquin River meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants. Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

### III.    VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A.   *Deficient SWPPP and Site Map*

Altium Packaging's current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map dated June 29, 2018, for the Facility are inadequate and fail to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

1.     The Site Map does not include all minimum required components for Site Maps as indicated in Section X.E of the General Permit as follows:

   A. An accurate depiction of all storm water drainage areas within the Facility boundary;

   B. Accurate storm water flow direction of each drainage area;

C.  At least one sampling location for every drainage area;

D.  Sampling points which are representative of facility operations;

E.  Nearby water bodies such as rivers, lakes and creeks; and

F.  All areas of industrial activity subject to the General Permit, including industrial storage areas, storage tanks, shipping and receiving areas, fueling areas, vehicle and equipment storage/maintenance areas, material handling and processing areas, material and scrap storage areas ("boneyards"), waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, cooling towers, and all other areas of industrial activity that may have potential pollutant sources.

2.  The SWPPP does not include all the required elements, as indicated below:

A.  The Facility's **scheduled operating hours**, including irregular operating hours (i.e. temporary, intermittent, seasonal, weather dependent) (Section X.D.2.d);

B.  A complete and detailed list of all **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a);

C.  A detailed, accurate and complete discussion of **Facility operations and all industrial processes** at the Facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each industrial process; and the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the corresponding containment capacity are also required to be identified and described. (Section X.G.1.a);

D.  The SWPPP does not include sufficient information regarding the products manufactured by the Facility (Sections X.G.1, XVII.B);

E.  An accurate and complete description of **Potential Pollutant Sources** and narrative assessment of all areas of industrial activity with potential industrial pollutant sources, including Industrial Processes, Material Handling and Storage Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks, Non-Storm Water Discharges and Erodible Surfaces (Section X.G);

F.   An identification of all **Non-Storm Water Discharges (NSWD**s) sources and drainage areas, including an evaluation of all drains (inlets and outlets) that identifies connections to the storm water conveyance system, and a description of how all unauthorized NSWDs have been eliminated (Section X.G.1.e);

G.   A discussion of the BMPs the Facility will implement to prevent cooling tower piped blowdown or other industrial materials from entering the storm water conveyance system and to ensure that all facility areas impacted by cooling tower discharges are cleaned as soon as possible (Section X.H.1.a);

H.   An appropriate **Monitoring Implementation Plan**, including an identification of team members assigned to conduct monitoring requirements, a detailed and accurate description of all discharge locations, a discussion of Visual Observation procedures and procedures for field instrument calibration instructions (Section X.I);

I.   An adequate and accurate discussion of the **Facility's Receiving Waters** and associated impairments (Section XI.B.6.e, Section X.G.2.ix);

J.   A complete and accurate Pollutant Source Assessment and the corresponding proper **sampling parameters** to include all potential pollutants present at the Facility likely to come into contact with stormwater (Section XI.B.6);

EDEN's investigation confirms that Chemical Oxygen Demand (COD), Biochemical Oxygen Demand (BOD), Total Petroleum Hydrocarbons (TPH), Iron and Zinc. are present in industrial operations at the Facility. The SWPPP fails to include these pollutants as **additional sampling parameters**, in violation of Section XI.B.6.c of the General Permit.

K.   An appropriate and complete discussion of **Drainage Areas and Outfalls** from which samples must be taken during Qualified Storm Events (Section X.I); and

L.   A discussion of **Exceedance Response Actions**.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### B.   *Failure to Comply with Facility SWPPP*

The Facility's current SWPPP certified on June 29, 2018, indicates that the Facility will collect and analyze storm water samples from two qualified storm events within the first half of

each reporting year (July 1 to December 31) and two QSEs within the second half of each reporting year (January 1 to June 30).

As detailed above, the Facility missed collecting storm water samples in the reporting years 2019-20, 2020-21, 2021-22, 2022-23, and 2023-24.

The Facility's Site Map, attached to the Facility's SWPPP dated June 30, 2015, identifies 4 discharge locations from which storm water run-off samples are to be collected: Drain 1, 2, 3 and 4.

As specified below, Altium Packaging failed to collect storm water samples from all outfalls as its Facility, in violation of its current SWPPP.

## C. Failure to Comply with General Permit Requirements for Handling Plastics

Altium Packaging has failed to comply with Section XVIII of the General Permit, which provides that all facilities covered under the General Permit which manufacture, transport, store or consume plastic materials are required to implement additional Best Management Practices (BMPs) to eliminate discharges of plastic in storm water, in addition to the other requirements of this General Permit applicable to all other industrial materials and activities.

Plastic materials include virgin and recycled plastic resin pellets, powders, flakes, powdered additives, regrind, dust, and other similar types of preproduction plastics with the potential to discharge or migrate off-site.

Facilities which handle plastic materials are required to install, at each on-site storm drain down gradient of areas containing plastic material, a containment system designed to trap all particles retained by a 1mm mesh screen, with a treatment capacity of no less than the peak flow rate from a one-year, one-hour storm.

Facilities which handle plastic materials smaller than 1mm in size must develop a containment system designed to trap the smallest plastic material handled at the facility with a treatment capacity of at least the peak flow rate from a one-year, one-hour storm, or develop a feasible alternative BMP or suite of BMPs that are designed to achieve a similar or better performance standard that shall be submitted to the Regional Water Board for approval.

Plastics facilities must also use durable sealed containers designed not to rupture under typical loading and unloading activities at all points of plastic transfer and storage; utilize capture devices as a form of secondary containment during transfers, loading, or unloading plastic materials; and must have a vacuum or vacuum-type system available for quick cleanup of fugitive plastic material available for employees.

If a containment system is not feasible, the facility must implement all eight of the BMPs specified in Section XVIII.A.2.b.

Altium Packaging's facility manufactures blow molded plastic bottles and handles pre-production plastics in its production processes.

From a review of the Facility's current SWPPP, as well as other information available to EDEN, Altium Packaging has apparently failed to date to install and maintain the required containment system or to implement the required BMPs.

**D.  *Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit***

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1.  Failure to Conduct Visual Observations and Maintain Required Records/Reports

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Section XI.A.3 required all Dischargers to complete contemporaneous records of all visual observations.  The records at a minimum must include the date, approximate time of the observation, the locations observed, the presence and probable source of any observed pollutants, the name of the person who conducted the observation, and any response actions and/or additional SWPPP revisions necessary to be taken in response to the visual observations.

Section XXI.H provides that Dischargers must produce copies of visual observation records to regulatory agencies upon request; and Section XXI.J.5 provides that Dischargers must retain either paper or electronic copies of visual observation records for at least five (5) years.

EDEN believes that between September 1, 2024 and the present, Altium Packaging has failed to conduct monthly and sampling visual observations pursuant to Section XI.A of the General Permit and to maintain contemporaneous written Visual Observation Reports confirming that visual observations were conducted.

2.  Failure to Collect and Analyze the Required Number of Storm Water Samples

In addition, EDEN alleges that Altium Packaging has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, an appropriate and accurate explanation must be included in the Annual Report.

As of the date of this Notice, Altium Packaging has failed to upload into the SMARTS database system the required number of storm water run-off sample analyses for the reporting years 2019-20, 2020-21, 2021-22, 2022-23, and 2023-24 and has not provided an adequate explanation for its failure to do so.

Furthermore, the Facility SWPPP in fact indicates that the Facility will collect storm water samples.

It appears that this facility has been operating as if it has a valid Sampling Frequency Reduction (SFR), when in fact it does not. According to Section XI.C.7 of the Industrial General Permit, a Discharger must certify via SMARTS that it meets specific conditions to be eligible for SFR, including having results from four consecutive Qualifying Storm Events (QSEs) that did not exceed any NALs/TNALs/NELs, and being in full compliance with all permit requirements. The facility has failed to properly certify its SFR status in SMARTS as required by the permit. This failure to certify constitutes a violation of the permit requirements and invalidates any reduced sampling frequency the facility may have been following.

3.  Failure to Collect Storm Water Run-Off Samples during Qualified Storm Events

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event (QSE) is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

Altium Packaging's stormwater runoff sample(s) collected as listed below were not collected during Qualified Storm Events as defined by the General Permit:

| Sample Date |
| --- |
| 12/2/19 |
| 1/16/20 |
| 1/27/21 |
| 10/25/21 |
| 1/5/23 |
| 3/8/23 |

4.   Failure to Comply with pH Sampling and Reporting Requirements

Pursuant to Section XI.C.2.a of the General Permit, the storm water sample "holding" time for pH analysis is 15 minutes, requiring in almost all cases that the facility conduct the pH test onsite, immediately after collecting the sample, and use a calibrated pH meter.  Use of pH strips is also an acceptable method if the facility has not previously entered Level 1 for pH exceedances and is not otherwise ineligible to use pH strips pursuant to Section XI.C.2 of the General Permit.

General Permit Section XXI.J requires Dischargers to contemporaneously complete a record of all measurements taken for the purpose of monitoring, including pH testing.  The monitoring records must be maintained for a period of five (5) years and must include the date, exact location and time the sample was collected and the pH testing was conducted; the individual who conducted the pH testing; the method used (e.g. pH strips or calibrated pH meter); and the results of the test.

Pursuant to General Permit Section XI.B.8, Dischargers are to strictly comply with the sampling procedures set forth in Attachment H of the Permit.  Attachment H provides that Dischargers must utilize a Chain of Custody form which must be included with the sample bottles when samples are shipped to or dropped off at the facility's laboratory.  General Permit Attachment C defines a Chain of Custody form as a form used to track sample handling from the place of collection to the laboratory, and indicates a Chain of Custody form is also used to track sampling analytical data.

General Permit Section XI.B.11.a requires that all sampling analytical data be reported to SMARTS within thirty (30) days of the date the Discharger obtains the results.  This includes results for pH testing conducted onsite, which must be included as a separate attachment to the Ad Hoc Monitoring Report, on either the Chain of Custody form or a separate document.

Altium Packaging's Ad Hoc Monitoring Reports for sample(s) collected on the following dates failed to include the required monitoring records for pH sampling allegedly conducted at the facility within the 15-minute holding period.

| |
|---|
| 12/2/19 |
| 1/16/20 |
| 12/12/20 |
| 1/27/21 |
| 10/25/21 |
| 3/28/22 |
| 1/5/23 |
| 3/8/23 |

5. Failure to Utilize the Correct Parameter Test Method

Table 2, Section XI.B.11 of the General Permit, specifies particular Test Methods for required sampling parameters, as listed below.

| PARAMETER | TEST METHOD |
|---|---|
| TSS | SM 2540-D |
| Oil & Grease | EPA 1664A |
| Zinc Total (H) | EPA 200.8 |
| Copper, Total (H) | EPA 200.8 |
| Lead, Total (H) | EPA 200.8 |
| COD | SM 5220C |
| Aluminum | EPA 200.8 |
| Iron | EPA 200.7 |
| Nitrate+Nitrite Nitrogen | SM 4500-NO3-E |
| Phosphorus | SM4500-P B+E |
| Ammonia (as N) | SM 4500-NH3 B+ C or E |
| Magnesium | EPA 200.7 |
| Cadmium | EPA 200.8 |
| Nickel | EPA 200.8 |
| Silver | EPA 200.8 |
| BOD | SM 5210B |

Altium Packaging's storm water analytical reports for samples collected on the following dates failed to utilize the proper Test Method of 1664A for Oil & grease:

| |
|---|
| 12/2/19 |
| 1/16/20 |

| |
|---|
| 12/12/20 |
| 1/27/21 |
| 10/25/21 |
| 3/28/22 |
| 1/5/23 |
| 3/8/23 |

6.  <u>Failure to Upload Storm Water Sample Analyses within 30 Days</u>

Section XI.B.11.a of the General Permit requires Dischargers to submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event.

Altium Packaging failed to upload into SMARTS within 30 days the following sampling and analytical results pursuant to Section XI.B.11.a of the General Permit:

| Sample Date | Lab Report Receipt Date | Date Uploaded into SMARTS |
|---|---|---|
| 12/2/2019 8:40 | 12/20/2019 | 7/9/2020 |
| 1/16/2020 12:30 | 1/28/2020 | 7/9/2020 |
| 12/12/2020 15:00 | 12/22/2020 | 7/13/2021 |
| 1/27/2021 14:35 | 2/10/2021 | 7/14/2021 |
| 10/25/2021 10:00 | 11/2/2021 | 7/11/2022 |
| 3/28/2022 8:35 | 4/12/2022 | 7/11/2022 |
| 1/5/2023 7:00 | 1/26/2023 | 5/12/2023 |

7.  <u>Failure to Collect Samples From Each Drainage Area at all Discharge Locations</u>

Section XI.B.4 of the General Permit requires Dischargers to collect samples from all discharge locations at all drainage areas, regardless of whether the discharges are substantially similar.

The General Permit defines "drainage area" as the "area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location."  (Attachment C to General Permit-Glossary)  EDEN's investigation confirms that there are at least 10 drainage areas at Altium Packaging's facility.

According to Altium Packaging's Site Map, the Facility has 4 sampling locations, specified as Drains 1, 2, 3, and 4.

EDEN's investigation confirms that there are at least 6 additional discharge locations at the Facility that require sampling locations but are not depicted on the Site Map, nor are they discussed in the SWPPP.  Specifically, there are a total of 9 drain inlets identified by the site map all of which are located in industrial drainage areas. Additionally, there is potential for storm water runoff to exit the facility at the southwest entrance/exit via sheetflow onto West Valpico Road and into the City of Tracy's MS4 system. Given that there are a total of 10 discharge locations at the facility, 10 sampling locations are required to satisfy the requirements of the General Permit.

The stormwater runoff sample analyses Altium Packaging uploaded failed to include samples from all discharge locations at the Facility. EDEN's investigation identified 10 total discharge locations requiring sampling, while Altium Packaging's own SWPPP and Site Map identified 4 sampling locations. However, the submitted analyses show samples taken from only 2 locations (Drain 1 and Drain 2). The following dates represent storm water sample collection events where Altium Packaging failed to sample from all required discharge locations:

| |
|---|
| 12/2/2019 |
| 1/16/2020 |
| 12/12/2020 |
| 1/27/2021 |
| 10/25/2021 |
| 3/28/2022 |
| 1/5/2023 |
| 3/8/2023 |

8. <u>Failure to Analyze Storm Water Samples for All Required Parameters</u>

General Permit sections XI.B.6.a and XI.B.6.b require all Dischargers to analyze for the following three parameters, regardless of facility type:  pH, Total Suspended Solids (TSS), and Oil & Grease (O&G).

Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment contained in the Facility's SWPPP.

Altium Packaging's SWPPP includes no additional sampling parameters based on the Pollutant Source Assessment contained in the SWPPP.

EDEN's investigation confirms that the following additional parameters must be included in the Facility's sampling process, as they are associated with Altium Packaging's industrial operations: Chemical Oxygen Demand (COD), Biochemical Oxygen Demand (BOD), Total Petroleum Hydrocarbons (TPH), Iron and Zinc.

Section XI.B.6.e of the General Permit requires Dischargers to analyze for any additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix. Test methods with lower detection limits may be necessary when discharging to receiving waters with 303(d) listed impairments or TMDLs.

The storm water runoff sample analyses Altium Packaging uploaded for samples collected on the dates listed below failed to include all required additional sampling parameters as outlined above.

| |
|---|
| 12/2/2019 |
| 1/16/2020 |
| 12/12/2020 |
| 1/27/2021 |
| 10/25/2021 |
| 3/28/2022 |
| 1/5/2023 |
| 3/8/2023 |

### E. *False/ Deficient Annual Reports Submitted to the Water Board*

Section XXI.L of the General Permit provides as follows:

**L. Certification**

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

*"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

Altium Packaging has failed to comply with Sections XVI.A, XXI.L and XXI.N of the General Permit by failing to submit complete and accurate Annual Report(s) to the Regional Water Board for the reporting year(s) 2019-20, 2020-21, 2021-22, 2022-23 and 2023-24.

Greg Eaglin and Jerry Gilbert, Efrain Vergil certified in the Facility's Annual Report(s) for the applicable reporting year(s), submitted to the Regional Water Board through the SMARTS system on July 9, 2020, July 21, 2021, and July 14, 2022, respectively, that the Facility had sampled the required number of Qualifying Storm Events during the reporting year(s) for all discharge locations and reduced the frequency of sampling at the facility area in accordance with the Sample Frequency Reduction in Section XI.C.7.

However, Altium Packaging did not adhere to all the conditions set forth in Section XI.C.7 by failing to certify a Samping Frequency Reduction in SMARTS. The facility collected and analyzed only 2 storm water samples during relevant reporting years.

Additionally, Efrain Vergil and Kevin Hernandez certified in the Facility's Annual Report(s) for the applicable reporting year(s), submitted to the Regional Water Board through the SMARTS system on July 14, 2022, July 12, 2023, July 14, 2024, respectively, that the Facility had reduced the number of sampling locations within a drainage area in accordance with the Representative Sampling Reduction in Section XI.C.4.

However, Altium Packaging did not, in fact, adhere to all the conditions set forth in Section XI.C.4 by failing to include a Representative Sampling Reduction justification in the Monitoring Implementation Plan section of the SWPPP. The current SWPPP was certified in SMARTS on June 29, 2018. As of this date, the Facility has failed to upload an updated SWPPP containing a Sampling Frequency Reduction and Representative Sampling Reduction justification and to certify each reduction's justification in SMARTS.

In addition, Altium Packaging's Annual Reports for the reporting years 2019-20, 2020-21, 2021-22, 2022-23 and 2023-24 contained objectively false information with respect to the number of discharge locations at the facility.  Specifically, each of the reports listed a different number of discharge locations, varying from 2 through 8.  In fact, there are 10 discharge locations at the facility,

Thus, Altium Packaging's Annual Report(s) submitted to the Regional Water Board through the SMARTS system on July 9, 2020, July 21, 2021, July 14, 2022, July 12, 2023, and July 14, 2024, as specified above contained objectively false information.

### F.　_Deficient BMP Implementation_

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology

("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that Altium Packaging has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges. Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Altium Packaging's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

EDEN has recently observed the facility and obtained evidence of the following ongoing BMP deficiencies:

- asphalt in poor condition;
- hazardous waste storage area door left open;
- significant oil spill outside hazardous waste storage;
- tracking observed from hazardous waste storage area;
- chemical or oil drums in poor condition, rust observed on lid;
- resin pellet storage tanks leaking into storm inlet;
- cooling tower leaking significantly and directly into drain inlet #3;
- scrap metal, wood, and otherwise debris thrown into bushes on site;
- significant quantity of wooden and plastic pallets exposed outdoors in the northwest area of the facility;
- used tires, trash, debris, rejected plastic, cardboard, paper, and broken wooden pallets contained in the pile of pallets in the northwest area;
- water pooling observed under the aforementioned northwest pile;
- uncovered waste bins;
- rust and other discoloration observed around the property; and
- vehicle fluid leak residue was observed at the truck receiving bay west of the facility.

### G. *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention

Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Altium Packaging has failed to comply with numerous standard conditions of the General Permit as outlined above and has failed to retain a QISP to trains its Pollution Prevention Team after entering Level 1 status, in violation of General Permit Section XII.

Based on the foregoing violations, it is clear that Altium Packaging has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Altium Packaging may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

### IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Altium Packaging LP, dba Consolidated Container Company LLC, formerly known as Consolidated Container Company LP, and G&I XI Central Valley Logistics Portfolio LP, as well as the respective corporate officers and employees of the Facility responsible for compliance with the CWA.

### V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is September 1, 2024, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

### VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215

The attorney assigned to this matter is:

Adam D. Brumm, Esq.
Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215, extension 906
Email:  adam@edendefenders.org

**To ensure an expedited response to this Notice, please send all initial communications to the following email address:**  responses@edendefenders.org.

## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of $57,617.00 per day, for each violation occurring on or after November 2, 2015.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to 33 U.S.C. § 1365(d), EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred in this matter.

## VIII.    CONCLUSION

60-Day Notice of Intent to Sue
Altium Packaging
August 14, 2024
Page 19 of 19

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages Altium Packaging's counsel to contact EDEN within 20 days of receipt of this Notice by sending an email to responses@edendefenders.org to initiate a discussion regarding the violations detailed herein and to determine how Altium Packaging may resolve this matter without the necessity of litigation.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if Altium Packaging wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If EDEN does not receive a response from Altium Packaging's counsel before the expiration of the 60-day notice period, this matter will be transferred to EDEN's litigation counsel.  Thank you.

Sincerely,

*EDEN Environmental Defenders*

Copies to:

Michael Regan, Director, U.S. Environmental Protection Agency, regan.michael@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov  and Laurie Kermish:  kermish.laurie@epa.gov
Eric Oppenheimer, State Water Resources Control Board, eric.oppenheimer@waterboards.ca.gov
Mayumi Okamoto, State Water Board Office of Enforcement:  Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov